* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Griffin and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission modifies in part and reverses in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On May 26, 2004, plaintiff sustained an injury by accident to his back.
2. On May 26, 2004, plaintiff alleges that an occupational disease to his right knee became disabling and he subsequently filed a workers' compensation claim. Defendants denied compensability of this claim.
3. The parties are bound by and subject to the provisions of the Workers' Compensation Act.
4. As of May 26, 2004, an employment relationship existed between plaintiff and defendant-employer.
5. U.S. Fidelity Guaranty was the carrier on the risk.
6. From May 26, 2004 until June 7, 2004, plaintiff was out of work as a result of his injuries. He received indemnity benefits from June 2, 2004 until June 6, 2004 in the amount of $380.46.
7. Plaintiff continued working for defendant-employer until August 21, 2004.
8. Plaintiff began working for the American Red Cross on October 14, 2004.
9. Documents stipulated into evidence include the following:
• Stipulated Exhibit Number 1, Pre-Trial Agreement
 • Stipulated Exhibit Number 2, plaintiff's responses to defendants' discovery requests
 • Stipulated Exhibit Number 3, excerpts from employment manual
 • Stipulated Exhibit Number 4, plaintiff's related medical records and bills
 • Stipulated Exhibit Number 5, post-injury wage records from defendant-employer
 • Stipulated Exhibit Number 6, post-injury wage records from the American Red Cross
 • Stipulated Exhibit Number 7, Duke University medical bills
 • Stipulated Exhibit Number 8, all Industrial Commission forms and filings
* * * * * * * * * * *
 EVIDENTIARY RULING
During the deposition of William Garrett, M.D., Ph.D., plaintiff introduced plaintiff's Deposition Exhibit Number 1, a letter from plaintiff's counsel addressed to Dr. Garrett inquiring about his medical opinion regarding plaintiff's right knee condition. Defendants objected to the admission of the exhibit on the grounds that the letter constitutes inadmissible hearsay. Dr. Garrett identified the letter and testified that the letter was "signed by my physician's assistant for me." Based on Dr. Garrett's authentication of the letter and the relevance of the contents of the letter, defendants' objection to the admission of plaintiff's Deposition Exhibit Number 1 is overruled and the exhibit is hereby admitted into evidence.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 40 years old. Upon graduation from high school, plaintiff earned a Bachelor of Science degree in Biology from Liberty University. Plaintiff also received a graduate degree in Mortuary Science from Fayetteville Technical Community College. Prior to working for defendant-employer, plaintiff worked in his family's funeral business and as a manager for Hanniford grocery store.
2. On July 2, 2001, plaintiff began working as a route sales representative for defendant-employer. Plaintiff continued working in this position during his tenure with defendant-employer. As a route sales representative, plaintiff was responsible for selling and delivering defendant-employer's products to convenience stores and grocery stores. Plaintiff worked approximately 14 hours per day, five and one-half days per week, spending approximately 12 and ½ hours of each day on his sales route.
3. To complete his job as a route salesman, plaintiff began the workday by reviewing paperwork and loading his delivery truck with defendant-employer's products. Plaintiff then drove to each of the 12 convenience stores on his route and discussed which items the customer needed. He returned to his truck, jumped up onto the back of the truck, which was approximately three to four feet off the ground, and loaded his dolly with boxes of products. Plaintiff then lowered the 50-pound dolly with about 80 pounds of products from the back of the truck. While lowering the dolly, plaintiff braced the weight of the loaded dolly with his body. Once the dolly was lowered to the ground, plaintiff jumped off the back of the truck and wheeled the dolly into the store.
4. Inside the store, plaintiff was responsible for placing the products on the store's shelves. Working his way from the bottom shelf to the top shelf, plaintiff removed older products, cleaned the shelves and rotated the products. To perform these duties, plaintiff either squatted or bent his back. Each shelf required about 15 to 30 minutes of attention.
5. When delivering products to a grocery store, plaintiff made approximately five or six trips to load more products on his dolly to be stocked. He generally made two trips to his truck for products to be stocked at convenience stores.
6. John Creamer, District Sales Leader, briefly supervised plaintiff for defendant-employer. Mr. Creamer confirmed that plaintiff accurately described his job duties. According to Mr. Creamer, all drivers were instructed to enter and exit their trucks by using a three-point stance maneuver. Defendant-employer did not consider hopping in and out the truck an appropriate method for entering and exiting the truck.
7. On May 26, 2004, plaintiff was loading boxes of products onto his truck to begin his daily deliveries. As plaintiff reached to move a pile of boxes around in his truck, he felt something pull in his back and pain in his right knee. The pain was more severe in his back. Plaintiff immediately reported the incident to Carla, who worked in defendant-employer's distribution center. At this point, plaintiff sought medical treatment at the emergency room of Duke University Medical Center.
8. At the emergency room, plaintiff reported the onset of back pain while lifting heavy boxes at work loading a truck. Plaintiff had also reported similar back pain in the past and on two occasions sought treatment with Dr. Lang for his back problem. Additionally, the emergency room medical records reflect that plaintiff complained of right knee pain. The attending physician diagnosed plaintiff with acute back strain and instructed plaintiff to take Tylenol and Motrin over the next week.
9. On May 28, 2004, plaintiff returned to the orthopaedic clinic at Duke University Medical Center for further evaluation. At this visit, plaintiff reported continued complaints of back pain and right knee pain, which developed about a month prior without any injury. It was noted that plaintiff underwent right knee surgery at the age of 18. In the last year prior to this evaluation, plaintiff had experienced minor pain with activity and occasional swelling in the right knee. Plaintiff believed the squatting and climbing required for his job with defendant-employer aggravated his right knee. John H. Lohnes, PA-C, diagnosed plaintiff with chronic recurrent muscular low back and right knee pain with possible early chondromalacia. Mr. Lohnes prescribed Flexeril and Bextra, physical therapy for the back, and wrote plaintiff out of work for one week with a full duty return to work release on June 7, 2004. Additionally, Mr. Lohnes noted that "I have also recommended that he look into lighter duty work in the future which would not involve repetitive stooping or bending, no lifting over 50 pounds and no squatting." Plaintiff was advised to return on an as needed basis.
10. Plaintiff returned to work in his route sales representative position on June 7, 2004. To perform his job, plaintiff modified his duties and reduced the number of hours that he normally worked. The symptoms in plaintiff's right knee became progressively worse as he continued to perform his normal duties. Unable to perform his regular duties, plaintiff inquired about a lighter duty position with defendant-employer. No such position was available and plaintiff gave notice to defendant-employer that he was leaving his employment effective August 21, 2004. At the time plaintiff gave notice of his resignation, he was unaware that his right knee would require surgery.
11. Defendants accepted compensability of plaintiff's back injury by Form 60 signed June 18, 2004.
12. On July 29, 2004, plaintiff reported to Mr. Lohnes that his back problems had improved, but expressed complaints of persistent medial right knee pain. Mr. Lohnes ordered an MRI, which was performed on August 5, 2004. The results of the MRI revealed a meniscus tear in the right medial meniscus. Mr. Lohnes referred plaintiff to Dr. William E. Garrett for consideration of right knee surgery.
13. On August 16, 2004, Dr. Garrett evaluated plaintiff with respect to the right knee and reviewed the results of the MRI. Dr. Garrett recommended right knee arthroscopy, which was performed on August 19, 2004. As a result of the right knee arthroscopy, plaintiff was unable to work from August 19, 2004 through October 13, 2004.
14. In early October 2004, plaintiff began applying for new employment. On October 14, 2004, plaintiff accepted a position as a blood collection specialist with the American Red Cross, earning approximately $13.00 per hour and working 40 hours per week. As a blood collection specialist, plaintiff interviews blood donors about their health history and other relevant matters to determine who is eligible to donate blood. Plaintiff also drives a van and trains people as part of his job with the American Red Cross. Plaintiff selected the position with the American Red Cross because the rate of pay was the highest compared to the other jobs he applied for and it was within his physical capabilities.
15. On February 22, 2005, counsel for plaintiff drafted a letter to Dr. Garrett outlining the duties of a route sales representative for defendant-employer. Dr. Garrett was asked, "[w]ould the above job duties place a worker at an increased risk (compared to members of the general public who don't perform such duties) for the development of Mr. Newton's knee condition?" The response for "probably yes" was checked. The second question posed by counsel was edited to read, "[i]n Mr. Newton's case, were these job duties the cause or at least a significantcontributing factor to his development of this knee condition?" The response to this question was also "probably yes." Further, additional comments were provided, which indicated that plaintiff's ". . . knee condition is likely related to . . . [his old football] injury with his job duties being a contributing factor to the recent symptoms." During his deposition, Dr. Garrett testified that he did not sign the letter; rather, the letter was signed at his direction by his physician's assistant. Dr. Garrett was not asked if the opinions expressed by his physician's assistant in the letter were also his opinions or if he agreed with them. The letter signed by Dr. Garrett's physician's assistant is the only evidence in the record of causation and increased risk.
16. At his deposition, however, Dr. Garrett could not state that the degenerative changes and the meniscus tear in plaintiff's right knee were caused by his job duties with defendant-employer. Dr. Garrett explained, "I don't know that his job or anybody's job does an awful lot towards creating degenerative changes in the knee. You get it anyway with getting older. . . . I don't know that his job made his meniscus tear, made the degenerative changes in his knee occur at all." Dr. Garrett did confirm that plaintiff's job duties made his knee condition symptomatic and suggested that plaintiff not return to his previous employment with defendant-employer if the job caused him significant pain.
17. The Commission gives greater weight to Dr. Garrett's deposition testimony rather than the letter Dr. Garrett directed his physician's assistant to sign. Thus, the Commission finds that the greater weight of the medical evidence shows that plaintiff's employment did not place him at a greater risk for contracting or developing his right knee condition.
18. As a result of his compensable injury by accident, plaintiff was incapable of earning wages in any employment from May 26, 2004 through June 6, 2004. From June 7, 2004 through August 19, 2004, plaintiff was partially disabled and capable of earning reduced wages. Plaintiff's incapacity to earn wages after August 19, 2004 was causally related to his non-compensable knee condition.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 26, 2004, plaintiff suffered a compensable injury to his back arising out of and in the course of his employment. N.C. Gen. Stat. § 97-2(6).
2. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally. Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the development of the disease. Hardin v.Motor Panels, Inc., 136 N.C. App. 351, 524 S.E.2d 368 (2000) (citing Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359
(1983). Even where the condition was aggravated but not originally caused by the claimant's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition. Futrell v. ResinallCorp., 357 N.C. 158, 579 S.E.2d 269 (2003).
3. In the case at bar, plaintiff failed to prove that his employment with defendant-employer placed him at a greater risk for contracting or developing the right knee condition than the general public. Accordingly, the plaintiff has failed to establish that he suffers from an occupational disease to his right knee within the meaning of N.C. Gen. Stat. § 97-53(13).
4. Plaintiff was released to return to work from his back injury on June 7, 2004. Plaintiff returned to defendant-employer, but modified his job duties and worked reduced hours. Plaintiff's right knee condition became worse, and plaintiff subsequently quit his employment with defendant-employer on August 21, 2004. As such, plaintiff's disability after August 21, 2004 was due to his right knee condition and not his compensable back injury. N.C. Gen. Stat. § 97-2(6).
5. As a result of his compensable back injury, plaintiff was disabled from any employment and is entitled to temporary total disability compensation at the rate of $540.68 per week from May 26, 2004 through June 6, 2004. N.C. Gen. Stat. § 97-29.
6. As a result of his compensable back injury, plaintiff was temporarily partially disabled and is entitled to temporary partial disability beginning June 7, 2004 through August 21, 2004, at the rate of two-thirds of the difference between his pre-injury average weekly wage of $811.02 and the average weekly wage he earned beginning June 7, 2004 through August 21, 2004. N.C. Gen. Stat. § 97-30.
7. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable back injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability. The approved medical expenses do not include treatment for plaintiff's right knee. N.C. Gen. Stat. §§ 97-25; 97-25.1
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee approved below, defendants shall pay plaintiff temporary total disability compensation at the rate of $540.68 per week from May 26, 2004 through June 6, 2004.
2. Subject to an attorney's fee approved below, defendants shall pay plaintiff temporary partial disability compensation beginning June 7, 2004 through August 21, 2004, at the rate of two-thirds of the difference between his pre-injury average weekly wage of $811.02 and the average weekly wage he earned beginning June 7, 2004 through August 21, 2004.
3. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident to his back, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability. The approved medical expenses do not include treatment for plaintiff's right knee.
4. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 and 2 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs of this action.
This 22nd day of May, 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER